IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE RENEE DISHONG, | ) | Case No. 5:23-CV-00044 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Michelle Renee Dishong, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Dishong challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in failing to provide an adequate explanation for finding the opinion of Jessica Twehues, Psy.D., only partially persuasive and that the ALJ's residual functional capacity ("RFC") determination was not supported by substantial evidence.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dishong's application for DIB be affirmed.

## I.     Procedural History

On January 21, 2019, Dishong applied for DIB, alleging she became disabled on May 22, 2018.  (Tr. 74).  The Social Security Administration denied Dishong's application initially and upon reconsideration.  *Id.*  ALJ Susan Smoot heard Dishong's application on May 14, 2020, and denied the application in a June 24, 2020 decision.  (Tr. 74, 85).

On February 1, 2021, Dishong reapplied for DIB, alleging that she became disabled on June 25, 2020.  (Tr. 191-192).  Dishong alleged she was disabled due to: (i) anxiety with obsessive compulsive disorder ("OCD") and panic attacks; (ii) depression; (iii) deep vein thrombosis ("DVT"); (iv) pulmonary embolism in her left lung with "wedge infarct"; (v) thrombophilia (a blood clotting disorder); (vi) chronic back pain with degenerative changes; (vii) adjustment disorder with insomnia; (viii) acute traumatic stress disorder; (ix) chronic pain related to scar tissue from the wedge infarct; and (x) shortness of breath that worsened with the temperature, humidity, and activity.  (Tr. 214).  The Social Security Administration denied her application initially and upon reconsideration.  (Tr. 99-107, 110-122).  Dishong requested an administrative hearing.  (Tr. 187-188).

On February 17, 2022, ALJ Paula J. Goodrich heard Dishong's case telephonically and denied her application in a May 10, 2022 decision.  (Tr. 15-33, 43-70).  In doing so, the ALJ determined that Dishong had the RFC to perform light work, except that:

> [T]he claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant must avoid concentrated exposure to humidity, extremes of heat and cold, and pulmonary irritants, such as fumes, odors, dust, gases, and poor ventilation; the claimant must avoid all exposure to unprotected heights, hazardous machinery and commercial driving; the claimant is able to perform simple, routine tasks, and multi-step instructions, conducted in a work-setting free of production-rate pace or strict production quotas, which setting is routine and predictable, in that it contemplates infrequent changes, explained in advance, which setting requires no more than occasional, superficial [defined as precluding tasks involving arbitration, confrontation, negotiation, collaboration, the persuasion of, direction of, or conferral of responsibility upon the claimant for the safety or welfare of, others] interaction with the public, and otherwise no more than superficial interaction with a small group of co-workers.  This finding departs from that of the previous decision, in order to accommodate the present state of the impairments, as documented in the current evidence.

(Tr. 21 (brackets in original)).  The Appeals Council denied further review rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  Dishong filed a complaint with this court seeking judicial review.  ECF Doc. 1.[1]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Dishong was born on December 31, 1971 and was 48 years old on the alleged onset date. (Tr. 210).  She completed college in 1997 and received training as a nurse.  (Tr. 215).  She previously worked as a nurse in various capacities, all of which the ALJ found she could no longer perform.  (Tr. 31, 215-216).

### B.    Relevant Medical Evidence

#### 1.    Physical – Pre-onset date

Due to the nature of some of Dishong's physical conditions, medical evidence pre-dating Dishong's alleged June 25, 2020 onset date has been included for context.

On March 19, 2015, Dishong saw pulmonologist Nicholas Proia, M.D., after having suffered a pulmonary embolism.  (Tr. 276).  Following an examination, Dr. Proia assessed Dishong with a pulmonary embolism with pulmonary infarction and indicated there was no evidence of residual DVT or right ventricular strain.  (Tr. 277).  Dr. Proia recommending adjustments to her medication, noted her risks of thrombophilia were modest, and recommended that she be observed at the hospital for two to three days.  *Id.*

On an unspecified date in 2019, Dishong underwent a carpal tunnel release procedure. (*See* Tr. 308).

On February 27, 2020, Dishong underwent a nerve conduction study.  (Tr. 507-512). Overall, her results were largely within normal range.  (Tr. 507-508).  She showed a limitation as

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

3

to the third digit on her left hand, her left elbow, her right wrist and third digit, and her right elbow.  *Id.*  Based on this, it was noted that she had mild right sensory median neuropathy and "very mild" left sensory median neuropathy and bilateral motor ulnar, indicating mild bilateral carpal tunnel.  (Tr. 509).

### 2.     Physical – Post-onset date

On June 26, 2020, Dishong underwent an MRI of her brain.  (Tr. 347).  Based on the changes identified, the interpreting radiologist noted that Dishong had indications of "intractable headaches, unspecified chronicity pattern, unspecified headache type," dizziness and giddiness, and syncope and collapse.  (Tr. 348).

On July 1, 2020, Dishong was seen at Poland Family Chiropractic, complaining of aching across both sides of her neck, and at the lumbar, sacral, mid thoracic and lower thoracic regions of her back, as well as tightness, stiffness, and discomfort.  (Tr. 296).  She reported some improvement and that her ability to "participate with employment and traveling and/or driving has improved with this complaint while bending over, walking and driving car."  *Id.*  She rated her discomfort as 8/10.  *Id.*  Dishong also reported extremity discomfort and/or paresthesia in her left shoulder.  *Id.*

On physical examination, it was noted that Dishong showed spinal restriction in her sacrum, pelvis, and across several vertebrae in her back; pain/tenderness in her upper to mid cervical, lower lumbar, and lumbo-sacral spine; muscle spasms across her shoulders, neck, back, buttocks, and pelvis; and range of motion concerns in her entire cervical and lumbar spinal regions.  *Id.*  In Dishong's assessment, it was noted that she was showing improvement and meeting expectations.  *Id.*  She underwent treatment and was instructed to ice her lumbar, lumbosacral, and cervical areas.  *Id.*  She was also instructed not to work out or do any type of strenuous activity.  *Id.*

On July 1, 2020, Dishong also had a scan of her heart completed, which, clinically, indicated that she had dyspnea and chest pain.  (Tr. 305).  Dishong also underwent an echocardiogram that indicated she had normal ventricular systolic functioning, and a trivial physiologic mitral and tricuspid regurgitation.  (Tr. 306).

On July 8, 2020, Dishong returned to her chiropractor with, generally, the same complaints but also reported improvement.  (Tr. 297).  A physical exam revealed largely the same limitations and findings as at Dishong's prior appointment, and she received treatment.  *Id.*

On August 7, 2020, Dishong saw Joshua Gordon, M.D., regarding her multiple neurological symptoms.  (Tr. 318).  Dishong reported that, following her pulmonary embolism, she felt "off," and that feeling had progressively worsened over the preceding five years.  *Id*.  She noted that about 6 months prior, she'd had a brain MRI that indicated non-specific white matter changes.  *Id.*  Dishong also recounted an incident where she got a "cerebral feeling," felt "fuzzy," had a high pulse, and felt faint; she indicated she felt "outside her body" for about 2 hours and slowly improved.  (Tr. 319).  Dishong also indicated that she felt she was losing dexterity in her hands, red lights looked smudged when she drove, she had intolerance for hot and cold, she would get numbness and tingling in her hands and feet, warm showers made her feel dizzy, and she had chronic tailbone pain.  *Id.*  Further, Dishong reported feeling disoriented; struggling to follow recipes; having panic attacks in stores, difficulty keeping up with her medication and frequent headaches, anxiety and panic attacks; and suffering from migraines for 12 years, with some progression.  *Id.*

On examination, Dr. Gordon indicated that Dishong's mental status was unremarkable, as were her cranial nerves, motor skills, coordination, reflexes, sensation, and gait.  *Id.*  A review of Dishong's systems indicated she was positive for weight gain, fatigue, vision loss/change, lightheadedness; shortness of breath with exertion and a cough; diarrhea, nausea/vomiting, and

heartburn; heat intolerance and excessive thirst; back pain; swelling of her arm or leg; memory loss, headaches, numbness/tingling, weakness and trouble swallowing; and stress or conflicts, depression, and anxiety. (Tr. 327). Dr. Gordon diagnosed Dishong with a white matter abnormality, memory loss, and a balance disorder. (Tr. 324). He ordered lab work to help assess why Dishong's non-specific white matter changed and ordered other testing. (Tr. 320).

On August 17, 2020, Dishong started treatment with James Walter, II, D.O., for her carpal tunnel syndrome, noting it had worsened since her surgery. (Tr. 308). It was noted that she had undergone a right carpal tunnel surgery, but she had right hand ring finger hypersensitivity, pain, burning, and weakness. *Id.* On physical examination, Dr. Walter noted that Dishong had no pain on palpation, full range of motion, full strength, but had decreased median nerve distribution, and tested positive for Tinel's at the "Carpal Tunnel distal aspect that sends tingle up ring finger." (Tr. 309). In all other regards, Dishong's physical exam was normal. *Id.* Dr. Walter's impression was that Dishong had carpal tunnel syndrome in her right hand and, after discussing treatment, Dishong elected to proceed with conservative treatment management. (Tr. 310).

On October 1, 2020, Dishong started therapy for her hand, and she was assessed with pain and numbness in her right arm, stiffness in her right wrist, weakness in her right arm, and carpal tunnel syndrome in her right wrist. (Tr. 435-437). Dishong also indicated she had some wrist stiffness and weakness. (Tr. 435). Dishong reported a history of pain and weakness that limited her activities; she fell on her right hand shortly after her carpal tunnel surgery and had issues with her hand since. (Tr. 436). She indicated that the surgery improved her pain from fatigue, but she now also had nerve pain. *Id.* She rated her right-hand pain at its worst as 7/10 and at its best 1/10 for fatigue and nerve pain. *Id.*

6

In Dishong's initial evaluation, she indicated that she had moderate difficulty doing such things as heavy household chores (washing floors), using a knife, and recreational activities involving her upper extremities (such as golfing).  (Tr. 1119).  She also indicated that she had severe difficulty opening a tight or new jar and carrying a shopping bag or briefcase.  *Id.*  Her pain moderately interfered with her daily activities, including her sleep, and Dishong rated her hand pain as moderate and the tingling in her arm, shoulder, or hand as severe.  *Id.*  Additionally, Dishong noted that in the recent past she had experienced the following problems: shortness of breath; pain or heaviness in her chest or pulsations in her body; dizziness/fainting; persistent pain at night; constant body pain; frequent heartburn/indigestion; frequent nausea/vomiting; recent and severe emotional disturbances; changes in vision; falls; feeling down, depressed, or hopeless; and feeling little interest or pleasure in doing things.  (Tr. 1120).  In an assessment of her range of motion, no pain was noted with any of the movements, and her right hand and arm movement was, generally, within 10 degrees of her left.  (Tr. 436).  She was instructed on ligament stretching and nerve gliding stretches.  (Tr. 435)*.*  It was noted that she had no need of assistance in sitting, standing, or walking.  *Id.*

From October 6 to November 5, 2020, Dishong had therapy for her right hand and arm.  (Tr. 423-434, 1130-1131).  Generally, Dishong indicated that, following therapy, she felt less pain and tightness in her hand and arm.  *See id.*  When noted, it was reported that she completed the therapy sessions with "some difficulty" (Tr. 425, 429, 433), and that Dishong did not need any help sitting, standing, or walking, and rated her pain between 3 to 5/10.  (Tr. 423, 425, 427, 429, 431, 433).  During her October 13, 2020 session, Dishong also noted that she drove 9 hours and her right hand and arm hurt from that, in combination with not being able to keep up with stretches and heat.  (Tr. 431).  During her October 27, 2020, Dishong reported being in more pain from overusing her arm for home improvement projects.  (Tr. 427).

On December 9, 2020, Dishong underwent an MRI of her lumbar spine that indicated she had multilevel neural foraminal stenoses; she did not have any facture, dislocation, or significant central canal stenosis.  (Tr. 332).  These results indicated that Dishong had low back pain, unspecified back pain laterality, of unspecified chronicity and relationship to her sciatica, and lumbar radiculopathy.  (Tr. 340).  Michael O'Brien, M.D., (Dishong's primary care physician), added the following addendum: "DJD/DDD with several protrusions, most prevalent at L2-L5 [w]ith multiple levels of canal narrowing and nerve root impingement.  Need PT and/or consult for injections."  (Tr. 728; *see also* Tr. 28).

On December 10, 2020, Dishong saw her chiropractor, complaining of discomfort and/or paresthesia in her lumbar, thoracic, and cervical regions of her spine, as well as in her legs.  (Tr. 298).  Dishong indicated she had been feeling worse since her last treatment.  *Id.*  On physical examination, multiple subluxations were discovered and adjusted, with it noted that Dishong's condition was especially acute with spasming, hypomobility, and end-point tenderness.  *Id.*  Following a chiropractic manipulation and adjustment, Dishong was instructed to stretch and ice the affected areas.  *Id.*  She was also referred for epidural injections.  *Id.*

On December 23, 2020, Dishong saw Dr. Gordon.  (Tr. 559).  Dishong reported that her feet felt abnormal "shortly after she stands after a long period of standing," she was getting a lot of prickling feeling in her nerves, her leg pain was worse and disrupted her sleep, Gabapentin made her sleepy, Cymbalta gave her a headache, she had heat and cold intolerance, and she had stopped taking Adderall.  *Id.*  Dr. Gordon noted that Dishong still suffered from significant cognitive issues.  *Id.*  A review of her system and physical examination results were, generally unremarkable.  (Tr. 559-560).  Dr. Gordon recommended she undergo a neuropsych battery of testing to "better identify targets for treatment."  (Tr. 559).

On July 1, 2021, Dishong had an MRI of her left ankle, from which the impression was that she had: (i) mild soft tissue swelling in the subcutaneous fat at the dorsum of her midfoot; (ii) a soft tissue marker at the anterolateral ankle, subjacent age-indeterminate tearing of a ligament; (iii) small dorsal talonavicular joint effusion, mild degenerative changes of the midfoot and tarsometatarsal joints; (iv) no acute osseous abnormality; and (v) mild medial flexor tenosynovitis.  (Tr. 548-549).  Dr. O'Brien added the following addendum: "soft tissue swelling with djd and age determinant ligament tear.  if sx persist need to see ortho or podiatry.  may have associated nerve pain.  i believe we have tried lyrica previously."  (Tr. 550).

On July 1, 2021, Dishong also saw Reed Graham, DPM, regarding her left foot pain. (Tr. 784-786).  Dishong reported having injured her ankle that April and having worsening pain. (Tr. 784).  A review of her systems was unremarkable, except for noted joint pain and stiffness, and her abnormal gait.  (Tr. 785).  On examination, Dr. Graham noted that Dishong had paresthesia in both legs; a 10-degree reduction in her dorsiflexion at the first metatarsophalangeal joints in both legs; pain in both Achilles tendons, the left sinus tarsi area, the peroneus brevis tendon, and the central band of the plantar fascia; and pain with palpation of the anterior ankle.  (Tr. 645).  He assessed her with acquired left hallux rigidus, as well as osteoarthritis in her left ankle, a sprain in a left ankle ligament, anterior tibial syndrome, peroneal tendinitis, left Achilles tendonitis, plantar fasciitis, pain in her foot and ankle, and metatarsalgia. (Tr. 646).  Dr. Graham instructed Dishong to walk in a staggered walking step-type gait, gave her an immobilizer boot, prescribed medication, and gave a trigger point injection.  *Id.*

On July 9, 2021, Dishong underwent a spirometry test, which indicate she had a moderately severe obstruction in her lungs.  (Tr. 543-545).

On July 26 and August 23, 2021, Dishong saw Dr. Graham.  (Tr. 779-782).  Although during her first appointment Dishong noted that an injection did not help her pain, at both

appointments, she noted continued chronic body pain and improvement from the use of the

immobilizer boot and adjusting her gait.  *Id.*  On her physical examinations, it was noted that she

had pain along some of her metatarsals and the sinus tarsi area of her foot, some discomfort

along the peroneal tendons and lateral ankle ligaments, but no pain along her Achilles tendon or

other ligaments.  *Id.*  After both appointments, Dishong was instructed to continue at-home

exercises, and, following her last appointment, to wean herself off of the immobilizer boot.

(Tr. 780, 782).

On August 31, 2021, Dishong underwent a chest CT that was unremarkable.  (Tr. 795).

On September 7, 2021, Dishong saw Dr. O'Brien and reported continued issues with

fatigue, chest pain, shortness of breath, and sensitivity.  (Tr. 698-699).  She reported having

similar issues ever since her pulmonary embolism, and her pulse was between 92 to 97, but

exacerbated by heat and humidity.  (Tr. 698).  Dr. O'Brien noted Dishong's issues caused

significant limitations.  *Id.*  A review of her systems was, generally, unremarkable, as were her

physical examination results.  (Tr. 698-699).

On October 14, 2021, Dishong had a CT scan of her head due to daily persistent

headaches, but the results were unremarkable.  (Tr. 1019-1020).

On October 21, 2021, Dishong saw Michael Louwers, M.D., regarding her pain and

breathing issues.  (Tr. 1041).  Dishong reported that her pain was in her back, lower extremities,

right hand and wrist, and left lung.  *Id.*  She indicated she'd had the pain since 2015 caused by

her pulmonary embolism and sitting and lifting at work.  *Id.*  She noted that bending, lifting, and

standing or sitting for long periods of time aggravated her pain, while lying down, stretching,

heat, and ice helped relieve it.  *Id.*  She also indicated she had difficulty sleeping, concentrating,

and felt blue sometimes.  *Id.*  On physical examination, Dr. Louwers observed tenderness on her

paravertebral muscles with palpation.  (Tr. 1042).  He also noted that she had a full range of

motion in her extremities, normal motor strength, and a normal gait.  (Tr. 1042-1043).

Dr. Louwers assessed Dishong with chronic pain syndrome, chronic pain, fibromyalgia, lumbago

with sciatica, other specified dorsopathies, and multiple sclerosis.  (Tr. 1043).  Dr. Louwers

started her on medication and ordered imaging to help determine the cause of her pain.

(Tr. 1043-1045).

On October 28, 2021, Dishong saw Dr. Graham.  (Tr. 998).  Dishong reported going to

pain management and no longer using her immobilizer boot.  *Id.*  She noted continued chronic

pain throughout her body, as well as pain in her hands and left foot, and breathing difficulties.

*Id.*  On physical examination, Dr. Graham observed pain along four metatarsal shafts as well as

the styloid process of the fifth metatarsal.  *Id.*  Dishong noted less pain along her sinus tarsi but

still some pain at one of her ligaments.  *Id.*  She also had tenderness along the tibialis anterior

and extensor digitorum longus tendon, but much less pain at the posterior tibial tendon.  *Id.*

Dr. Graham noted she had good range of motion but was guarded and had weakness with

dorsiflexion and plantarflexion.  *Id.*  Dr. Graham's assessment remained largely the same, and

the plan was for Dishong to continue her home therapy and wear stiff shoes.  (Tr. 999).

On November 17, 2021, Dishong underwent a spinal MRI that was unremarkable.

(Tr. 1011-1012).

On November 18, 2021, Dishong also saw Dr. Louwers regarding her pain.  (Tr. 1037).

Dishong reported that her pain was in her back, lower extremities, right hand and wrist, and left

lung.  *Id.*  She indicated she'd had the pain since 2015, caused by her pulmonary embolism and

sitting and lifting at work, both of which if done for long periods of time also aggravated her

pain.  *Id.*  She indicated lying down, stretching, heat, and ice improved her pain.  *Id.*  On physical

examination, Dr. Louwers observed tenderness on Dishong's paravertebral muscles.  (Tr. 1038).

Dr. Louwers's assessment remained the same, and he ordered lab work for Dishong and instructed her to continue seeing her mental health counselor.  (Tr. 1038-1039).

On November 30, 2021, Dishong saw Dr. Graham.  (Tr. 1000).  Dishong's reported complaints were largely the same as before, with her adding that both of her feet felt like somebody was doing an Indian rub on her skin and that she was able to cut her grass with a riding lawnmower.  *Id.*  On physical examination, Dr. Graham's observations were largely the same as from their prior appointments, and he assessed her with a sprain in a ligament of her left ankle, acquired left hallux rigidus, osteoarthritis in her left foot, pain in her left foot and ankle, and metatarsalgia.  (Tr. 1001).  Dr. Graham provided Dishong with an ankle brace and instructed her to ice her ankle at home and not do any squats or climb ladders.  *Id.*

On March 8, 2022, Dishong was discharged from her occupational therapy for failing to schedule and/or keep appointments.  (Tr. 1101).

### 3.      Mental Health

On September 8, 2021, Dishong started mental health treatment with Red Oak Behavioral Health.  (Tr. 855).  She indicated that she had the following symptoms of depression: depressed mood, diminished interest or pleasure, significant appetite or weight change, insomnia, psychomotor agitation, diminished ability to think/concentrated, social isolation, crying spells, irritability, lack of motivation, fatigue or loss of energy, feelings of worthlessness, excessive guilt, indecisiveness, decreased motivation, change in libido, and feelings of hopelessness and helplessness.  *Id.*  She also reported the following symptoms of anxiety: excessive and difficult to control anxiety and worry, restlessness, easily fatigued, difficulty concentrating or her mind going blank, irritability, muscle tension, and sleep disturbance.  *Id.*  Dishong also reported some strain on her relationships with some of her children due to her prior divorce and a prior history of trauma, citing her faither's alcohol abuse and her first marriage.  (Tr. 855-856).

In summarizing the session, the attendant noted that Dishong cried throughout it and stated that her life "has been completely turned upside down and that she does not recognize who she is." (Tr. 856). The attendant also noted that Dishong was fully orientated; well groomed; alert; and cooperative; and had good immediate, short, and long-term memory; a withdrawn mood with a logical thought process; a flat affect, and "presented appropriate verbal communications, euthymic." *Id.* Dishong was diagnosed with adjustment disorder with mixed anxiety and depressed mood. (Tr. 858). It was recommended that Dishong attend individual therapy. *Id.*

On November 11, 2021, Dishong underwent an assessment with Red Oak Behavioral Health. (Tr. 1002). Dishong reported on her family relationships and that she "just exist[ed]," did not leave her house, did not have any friends, frequently cried, and had decreased interest, a lack of motivation, and fatigue. *Id.* Dishong was noted to have largely the same symptoms as at her initial evaluation, including food restrictions, nightmares, anhedonia, low self-esteem, racing thoughts, sadness, agoraphobia, avoidance behavior, flashbacks, frequent worrying, obsessions, panic attacks, and food restrictions. (Tr. 1003-1006). Dishong's diagnosis remained the same and she was instructed to continue her therapy and medication options. (Tr. 1008-1009).

On November 18, 2021, Dishong saw Dr. Louwers regarding her mental health. (Tr. 1031). Dishong reported on her family relationships, prior marriage, and her history of anxiety and depression. (Tr. 1031-1033). Dishong indicated she'd had increased depression/anxiety over the preceding four years due to her health concerns. (Tr. 1033). Dr. Louwers conducted a mental health examination and made the following observations. Dishong was alert, fully oriented, adequately groomed, and cooperative, and had a flat but pleasant expression, underactive motor activity, appropriate speech, good concentration, intact memory, depressed/flat mood, appropriate thought processes, worrisome but appropriate thought

13

content, an average intellect, and intact judgment.  (Tr. 1034-1035).  Dr. Louwers assessed

Dishong with major depressive disorder, generalized anxiety disorder, and attention-deficit

hyperactivity disorder.  *Id*.

On February 1, 2022, Dishong was seen at Red Oak Behavioral Health.  (Tr. 1094).

Dishong reported generally the same depression and anxiety symptoms as from her prior

appointment.  *Id.*  It was noted that Dishong was working on resolving the core conflict at the

source of her anxiety, and reducing the overall frequency, intensity, and duration of her anxiety,

in addition to recognizing, accepting, and coping with feelings of depression.  *Id.*  Overall,

Dishong "continued to strive towards a good prognosis of progress."  (Tr. 1095).

### C.      Relevant Opinion Evidence

#### 1.      Physical

##### a.      Physical RFC Assessment – Michael O'Brien, M.D.

On September 7, 2021, Dr. O'Brien completed a physical RFC assessment for Dishong.

(Tr. 845-852).  He noted his primary diagnosis of "carpal tunnel," and secondary diagnoses of

tachycardia and cold intolerance.  (Tr. 845).  In terms of exertional limitations, Dr. O'Brien

assessed that Dishong was limited to: (i) occasionally lifting or carrying 10 pounds,

(ii) frequently lifting or carrying 10 pounds, (iii) standing and/or walking for less than 2 hours in

an 8-hour workday; (iv) sitting for a total of less than 6 hours in an 8-hour workday; and

(v) pushing or pulling was limited in both her upper and lower extremities.  (Tr. 846).  In support

of these limitations, Dr. O'Brien noted Dishong's carpal tunnel pain, weakness, tachycardia with

exertion, shortness of breath with exertion, the MRI of her spine, the arthritis in her feet, and

damage to a ligament in her left foot.  (Tr. 847).

In terms of postural limitations, Dr. O'Brien indicated that Dishong was limited to:

(i) occasionally climbing ramps, stairs, ladders, ropes, and scaffolds due to her tachycardia;

(ii) occasional balancing; (iii) never stooping because she could not put pressure on her ankle; (iv) occasionally kneeling due to her difficulty in getting back up; (v) never crouching because of the damage to her left ankle ligaments; and (vi) occasionally crawling due to her difficulty getting back up.  *Id.*  Dr. O'Brien also found various manipulative limitations, noting Dishong was limited in her reaching, had nerve damage which limited her handling, had a limited ability to finger objects because of her difficulty with precision, and had limited feeling due to cold intolerance in her right hand.  (Tr. 848).  Environmentally, Dr. O'Brien noted Dishong had limited hearing in a noisy environment and limited speaking ability during panic attacks. (Tr. 849).  He also noted she should avoid even moderate exposure to extreme cold due to the cold intolerance in her right hand, to extreme heat due to her tachycardia, and to poorly ventilated areas and humidity due to her shortness of breath.  *Id.*  He concluded she should avoid concentrated exposure to noise due to her anxiety and vibrations due to her right hand and avoid even moderate exposure to hazards due to her balance issues.  *Id.*  Dr. O'Brien listed other symptoms Dishong had but did not provide any substantive explanation to whether they stemmed from a medically determinable impairment, if they were disproportionally severe or of expected duration, or on their consistency with other evidence.  (Tr. 850).

> **b.  Medical Source Statement – RFC – Michael O'Brien, M.D.**

On December 29, 2023, Dr. O'Brien completed another medical source statement on Dishong's physical capacity.  (Tr. 1055).  He found that Dishong suffered from largely the same exertional limitations as before, but noted she could only occasionally lift/carry 5 to 10 pounds and could only stand/walk or sit for 2 hours in an 8-hour workday.  *Id.*  He also found that Dishong should never stoop or crouch, and only rarely climb, balance, kneel, and crawl because of her Achilles tendonitis, lightheadedness, and dizziness.  *Id.*  He further found that she could

15

only occasionally reach, push/pull, finely manipulate, and grossly manipulate because of her carpal tunnel syndrome and dexterity issues.  (Tr. 1056).

Dr. O'Brien also concluded that Dishong had various environmental limitations due to her risk of falling, trouble focusing and concentrating, heat/cold intolerance, pain, tachycardia, and shortness of breath.  *Id.*  He noted that he had prescribed a brace for Dishong's left ankle, a TENS unit, and a nebulizer.  *Id.*  He also indicated Dishong needed help alternating positions and lying down, and experienced moderate to severe pain chronically in her right hand, left foot, left side, and migraines.  *Id.*  Her pain, he noted, interfered with her concentration, took her off task, and caused absenteeism.  *Id.*  Dr. O'Brien also found that Dishong needed to elevate her legs at will and would require additional unscheduled rest periods during an 8-hour workday, concluding she would need 8 hours of rest time.  *Id.*  He noted that Dishong's panic attacks, chronic fatigue, and temperature intolerance, among other things, would interfere with her ability to work 8 hours a day 5 days a week.  *Id.*

### c.    Physical Consultative Examination – Bradford Jones, D.O.

On September 11, 2021, Dishong saw Bradford Jones, D.O.[2], for an evaluation. (Tr. 938-943).  Dishong reported that, following her pulmonary embolism, she'd had progressively worsening tachycardia.  (Tr. 938).  She indicated that she currently experienced: dizziness, exhaustion, and weakness; she also reported using two to three pillows when lying flat, having difficulty sleeping due to shortness of breath, and chest pain with rest and exertion. *Id*.  Dishong noted that she used to smoke and had COPD with a moderate to severe obstruction. *Id*.  Her daily activities included cooking, housework, walking, laundry, sweeping, washing dishes, using the internet, and caring for pets.  (Tr. 939).

---

[2] The ALJ refers to Dr. Jones as Dr. James.  (*See* Tr. 28).

A review of Dishong's systems was negative, save for notations related to her medical history.  (Tr. 940).  On physical and neurological examination, Dr. Jones's observations were largely unremarkable, but he noted that, although Dishong could walk normally, she had tenderness around her ankles and did not walk on her heels or toes or attempt to squat.  (Tr. 940, 942).  Dr. Jones also found that Dishong's range of motion and muscle strength were normal.  (Tr. 944-948).  Dr. Jones noted possible diagnoses of dyspnea on exertion, left ankle pain, and anxiety, and his impression was that Dishong would benefit from further evaluation of her ankle and the etiology of her cognitive issues and how they played into her work capability.  (Tr. 943).  But he concluded she had no limitations with sitting, standing, or walking; no significant limitations with lifting or carrying; and he could not assess limitations for bending, stooping, crouching, and squatting because Dishong gave no attempt to squat during the exam.  *Id.*  He also found that she had no manipulative limitations.  *Id.*

### a.  State Agency Consultants

On April 2, 2021, Steve McKee, M.D., reviewed the medical evidence concerning Dishong's physical limitations.  (Tr. 105).  Dr. McKee adopted the June 2020 decision of the ALJ from Dishong's prior claim, which found that:

> [Dishong] has the residual functional capacity to perform light work except [she] can frequently push/pull and operate hand controls with the right upper extremity. She can frequently climb ramps and stairs and never climb ladders, ropes and scaffolds.  She can frequently stoop and crawl.  She can frequently handle and finger with the right upper extremity.  She should avoid exposure to dangerous moving machinery and unprotected heights.

*Id.*

On October 11, 2021, Mehr Siddiqui, M.D., reconsidered the medical evidence.  (Tr. 118-119).  He concluded that Dishong was limited to occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, was similarly limited in her pushing and pulling, could stand and/or walk for 6 hours in an 8-hour work day, could sit for 6 or more hours

"on a sustained basis" in an 8 hour work day, and could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (Tr. 118).  He found that Dishong did not have any manipulative, visual, or communicative limitations.  (Tr. 119).  But Dr. Siddiqui found that Dishong should avoid concentrated exposure to extreme hot and cold and humidity and avoid all exposure to hazards.  *Id.*

### 2.    Mental Health

#### a.    Psychological Evaluation – Evelyn T. Rivera, Ph.D.

On May 10, 2021, Dishong saw Evelyn Rivera, Ph.D., for a psychological evaluation. (Tr. 639).  Dishong reported that she had previously been in counseling for anorexia and depression, and she had been on medication for anxiety.  (Tr. 640).  Dr. Rivera conducted a mental status examination and made the following observations.  (Tr. 640-641).  Dishong appeared well groomed, had logical and coherent thoughts and speech, and described her mood as depressed and her energy low, and Dr. Rivera noted that Dishong cried at the interview. (Tr. 640).  Dr. Rivera did not observe any overt symptoms of anxiety but noted that Dishong self-reported some symptoms.  (Tr. 641).  Dishong was fully alert and appeared to have average intellectual functioning.  *Id.*  Dishong reported that she could do light cleaning and take of her personal hygiene, but she was unable to do any heavy lifting.  *Id.*  Dr. Rivera provisionally diagnosed Dishong with an unspecified anxiety disorder and unspecified depressive disorder.  *Id.*

Dr. Rivera also provided a functional assessment for Dishong.  (Tr. 642).  She indicated Dishong was able to understand her questions but that her depressed mood, anxiety symptoms, low energy, and her limited coping skills "will affect her ability to carry out instructions."  *Id.* Dr. Rivera noted her observations about Dishong's focus during the interview and self-reported symptoms but did not make any findings as to she functional limitations in maintaining attention, concentration, persistence and pace.  *Id.*  Dr. Rivera also noted that Dishong's ability to respond

appropriately to supervision and to work stress would be affected by her depressed mood, anxiety symptoms, low energy, and her limited coping skills.  *Id.*

### b.        Psychological Evaluation – Jessica Twehues, Psy.D.

On September 14, 2021, Dishong underwent a psychological evaluation by Jessica Twehues, Psy.D.  (Tr. 949).  Dishong reported that she was seeking disability following two pulmonary embolisms.  *Id.*  Dishong described her family relationships, educational history, and physical health conditions.  (Tr. 950).  She also noted that she was currently in mental health treatment and was on medication to help her concentration and anxiety.  *Id.*  Dishong described her mood as "sad and worthless most of the time due to physical pain and fatigue," noting that she had difficulty coping with her physical health problems.  (Tr. 950-51).  She also reported difficulty sleeping (due to restless leg syndrome), worrying a lot, crying easily and often, having limited energy, fatigue, reduced appetite, feelings of agitation with herself, feeling anxious and stressed most of the time, and having difficulty focusing and being forgetful.  *Id.*  She also noted having panic attacks once or twice a week.  *Id.*  As to her daily living activities, Dishong reported that she spent her day sitting on her couch, playing games on her phone, and letting her dogs in and out.  *Id.*  She would drive on rare occasions, showered every other day, and she tried to complete chores.  *Id.*  She did not have any friends at this time, except for on social media.  *Id.*

Dr. Twehues performed a mental status examination on Dishong and made the following observations.  (Tr. 951-952).  Dishong appeared to have good personal hygiene and was pleasant, cooperative, of average intellectual abilities, tense, fidgety, alert, and fully oriented. (Tr. 951-952).  Dishong also had normal speech; logical, coherent, and goal-directed thoughts, a depressed mood, normal mental content, adequate recall abilities, demonstrated insight, and sufficient judgment.  *Id.*  Dr. Twehues also noted that Dishong cried when speaking of her health

problems. (Tr. 952). Dr. Twehues concluded that Dishong's symptoms were consistent with unspecified depressive disorder and anxiety disorder. *Id*.

Functionally, Dr. Twehues concluded that Dishong would likely not show any limitations as to her ability to understand, remember, and carry out instructions. (Tr. 953). As to Dishong's ability to maintain attention and concentration and maintain persistence and pace, Dr. Twehues concluded that Dishong noted some deficits as to her concentration and stated:

> Due to her experience of depressed mood, anxiety, and panic attacks, she is expected to experience some difficulty maintaining focus for prolonged periods of time. She does appear prone to somewhat higher than usual rate of absenteeism from work as a result of mental health symptoms. However, she reported leaving her most recent job mostly due to physical health problems.

*Id.* As to responding appropriately to supervisors and coworkers, Dr. Twehues found that Dishong may appear irritable and agitated, but she appeared capable of taking orders as needed and had no history of interpersonal conflict. *Id.* Dr. Twehues also concluded, as to Dishong's ability to respond appropriately to work pressure, that "[i]ncreased stress and pressure would likely make it somewhat more difficult for her to focus and persist on work related tasks." (Tr. 954).

### c. Medical Source Statement – Mental Capacity – Michael O'Brien, M.D.

On December 29, 2021, Dr. O'Brien completed a medical source statement on Dishong's mental capacity. (Tr. 1052-1053). As to her ability to understand and remember, Dr. O'Brien found that Dishong had mild limitations across the area of functioning, except for in her ability to recognize a mistake and correct it and sequence multi-step activities where she was moderately limited. (Tr. 1052). As to her ability to respond appropriate to interact with others, Dr. O'Brien found that Dishong was moderately limited across the areas of functioning, except for in her ability to initiate or sustain conversation where she had a marked limitation. *Id.* As to her ability to concentrate and persist or maintain pace, Dr. O'Brien found that she had (i) an

extreme limitation in her ability to work a full day without needing more than the allotted number or length of rest periods during the day, (ii) marked limitations in her ability to ignore or avoid distractions while working and in sustaining an ordinary routine and regular attendance at work, (iii) moderate limitations in her ability to work at an appropriate and consistent pace, complete tasks in a timely manner, and work close to or with others without interrupting or distracting them, and (iv) only a mild limitation in her ability to change activities or work settings without being disruptive.  (Tr. 1053).  Lastly, as to her ability to adapt and manage herself, Dr. O'Brien found that Dishong had at most a moderate limitation in some areas of functioning.  *Id.*

### d.      State Agency Psychiatric Consultants

On June 1, 2021, Aracelis Rivera, Psy.D., reviewed the medical evidence in support of Dishong's mental health limitations.  (Tr. 105-106).  Rivera adopted the ALJ's findings from the prior decision in June 2020, which found that:

> [Dishong] can perform simple routine tasks as well as multistep instructions in a setting free of fast-paced production requirements or strict production quotas, and that is routine and predictable, where changes are infrequent and can be explained in advance.  She can have superficial interaction with others superficial meaning she should not be required to perform work tasks that involve arbitration, confrontation, negotiation, collaboration, persuading others, directing the work of others or bring responsible for the safety and welfare of others.  She can interact with a small group of coworkers.  She can have occasional interaction with the general public.

(Tr. 106).  On October 5, 2021, Jennifer Swain reconsidered the medical evidence in support of Dishong's mental health limitations and affirmed Rivera's adoption.  (Tr. 120).

### 3.      Function Report – Michelle Dishong

On February 24, 2021, Dishong completed a function report.  (Tr. 230-237).  Dishong reported that she was limited in her ability to work by her chronic back pain, which made it difficult to drive and imposed various postural limitations; her neurological pain in her legs and

feet, which made walking difficult and disrupted her sleep; and her right hand carpal tunnel syndrome, which caused her to be unable to carry more than a couple pounds due to the pain and weakness, as well as difficult to do any movement requiring dexterity and range of motion. (Tr. 230).  She described her day as taking her medication, brushing her teeth, letting her dogs out, performing light housework with frequent breaks, cooking dinner, spending time with her family, and watching television; she noted she was not interested in TV because she could not focus.  (Tr. 231).  She would take care of her pets, and her husband and children helped.  *Id.*

Prior to her conditions, Dishong reported that she was able to work 60 to 70 hours a week, perform house and yard work, cook, clean, be active at her children's school, fish, kayak, and to various other social activities.  *Id.*  Dishong noted that her chronic pain and left lung area made it difficult to sleep, indicating she slept less than four hours in a 24-hour period and, once she fell asleep, she did not hear alarms.  *Id.*  Dishong reported various issues in maintaining her personal hygiene based on her carpal tunnel (such as clothing buttons and zippers), her pulmonary issues (such as her heart racing in the shower), and shaving (such as pain when bending over).  *Id.*  She also used alarms to remind her to take her medication, but she would still miss three or more doses a week due to being distracted, and her husband would also remind her. (Tr. 232).  She would prepare simple meals, such as meatloaf or hamburgers, and liked to try new recipes, but found herself struggling to properly follow them.  *Id.*  She indicated that she tried to make dinner five times a week, and it would take her longer because she needed frequent breaks.  *Id.*  She found it harder to use her hands when cooking or in opening items, she made more mistakes when cooking, and she would get upset if someone stayed in her space.  *Id.*

Dishong reported that she was still able to perform household chores, such as washing dishes, laundry, or dusting; all of which took her longer because of the help she needed or her breaks.  *Id.*  She estimated that the chores took about three times as long.  *Id.*  She indicated she

needed help lifting heavy items, and her son would run the sweeper because she would get short of breath.  *Id.*  She no longer did yard work due to issues with her stamina and temperature intolerance, noting one day of housework would require one to two days to recover.  *Id.*

Dishong reported that she would only go outside when the humidity was low, and the temperatures were comfortable; she would cancel plans if she could not breathe from higher humidity.  (Tr. 233).  The cold would also intensify her pain, heat would cause her to become dizzy and unsteady, and her anxiety and psychological conditions would cause her to avoid public places and socializing.  *Id.*  Her husband typically drove and, although she could go out alone, she would try to have someone go with her because she would otherwise get panic attacks or have anxiety.  *Id.*  Although she could drive, her husband usually did because she experienced visual disturbances, had panic attacks, and could become disoriented.  *Id.*  She typically shopped by computer; she would only go to stores if she had someone with her.  *Id.*  She would "sometimes" forget to account for transactions or misplace cash.  *Id.*

Dishong reported that her interests are "invested in surviving," noting that: she no longer kayaked or fished, home projects took her longer to recover from, and she could only ride short distances on her husband's motorcycle.  (Tr. 234).  She indicated that she did not do any of her hobbies often because she did not have the energy.  *Id.*  Dishong reported that she had "no quality of life" and just "d[id] not enjoy life anymore."  *Id.*  As to socializing, Dishong noted that she spent time with others in person, and communicated by phone, email, texting, and video chatting, but she preferred texting and usually only interacted with her husband, children, and mother.  *Id.*  A couple of times a year her husband and she would go to a casino, they went out to eat about three times a month, and she would have lunch with a friend once every four to six months.  *Id.*

23

Dishong reported that she needed reminders to go places; she did not like to leave the house; and she would cry or panic if she had to attend an appointment alone, so she usually tried to bring someone. *Id.* She did not, generally, have problems getting along with others and she generally kept to herself. *Id.* Before her conditions, Dishong was outgoing, active, and was involved in her children's school, but now she found it easier to close herself off. *Id.*

Dishong indicated that her conditions impacted her ability to do everything except understand, estimating that she could lift less than 10 pounds. (Tr. 235). How far she could walk depended on the weather and terrain, and she would get short of breath after one trip up and down the stairs or about 5 minutes of walking. *Id.* It would take her a long time to focus on a task and complete it, often pausing to formulate her thoughts or remember things after forgetting them. *Id.* Regarding written instructions, she noted that she had started struggling to complete a recipe and she could manage spoken instructions, if they were only a few steps and she was familiar with the topic. *Id.* If the instructions were more complex, she struggled and would forget the earlier steps. *Id.* She had never had an issue with authority or respect. *Id.* She handled stress and changes in her routine poorly. (Tr. 236). She noticed that she was now constantly worrying. *Id.*

### B. Relevant Testimonial Evidence

Dishong testified at the administrative hearing. (Tr. 51-64). Dishong reported that she lived with her husband and 16-year-old son, she did not work, and she had a driver's license and a handicap placard. (Tr. 52-53). She had a two-year nursing degree. (Tr. 53). Dishong testified that she was unable to work because of her issues breathing, panic attacks, tachycardia, chronic fatigue, with her memory, ability to stretch, and pain. *Id.* She indicated that she struggled to do normal daily activities, such as showering, tidying up the house, or making meals. (Tr. 54). She spent 90% of her day lying down with her feet elevated because her tailbone pain made it hard to

sit.  *Id.* She also had issues carrying things, opening plastic baggies or jars, and her depression and anxiety made her tearful.  *Id.*  She suffered from migraines, had difficulty breathing when it was humid, would get leg and feet cramps when walking, would get frustrated and panic if she drove, and had issues with fatigue and an elevated heart rate, which made it hard for her to do anything.  (Tr. 54-55).

As to her breathing, Dishong testified that it was affected by the humidity and extreme hot or cold.  *Id.*  She noted that she would get migraines three to four times a week, and they could last from hours to days.  (Tr. 56).  She had medication for them, but she tried to use sparingly because it made her tired.  *Id.*  She indicated that she also had full-body pain, but it was particularly bad in her right hand, right arm, back, and tailbone.  *Id.*  She ended up having to shift her weight when she was sitting, and she also had pain in her left side from her pulmonary embolism.  (Tr. 56-57).  She would need to shift in her seat about every 15 minutes and she could stand or walk for about a half hour before her legs, back, or breathing would become an issue.  (Tr. 57).  She indicated that after 10 or 15 minutes she would start breathing heavily.  *Id.*  She estimated she could lift a 12-pack of soda or a gallon of milk.  (Tr. 58).  She noted that after a while, her writing would become illegible, her hands would cramp after about a page, and she would drop things from her right hand.  *Id.*

Dishong testified that she also tried to avoid stress and, if she could not avoid it, she would cry.  *Id.*  She spent most of her time alone and with her dogs, and she went to counseling about once a week.  (Tr. 58-59).  She needed someone to attend appointments with her because she had a hard time remembering questions she had and what she was told.  *Id.*  She also did not sleep well, waking up periodically during the night and having trouble falling back asleep, which made her tired the next day.  (Tr. 59-60).  She mostly interacted with people through text messages or social media, but she would call her mother.  (Tr. 60).  She would spend her time

"laying and reclining stressing over not being able to do things," and being aggravated and frustrated because she needed help to accomplish what she wanted to have done. (Tr. 60-61). Since the hearing on her prior application, she believed her breathing and tachycardia had worsened. (Tr. 61). She had previously seen a pulmonologist, but they indicated there was nothing they could do aside from a dangerous cardiac surgery, which the doctors were unsure would improve her quality of life. (Tr. 61-62). Dishong indicated that she had side effects from her medication because of her hypersensitivity, including with alertness, fatigue, grogginess, and nausea. (Tr. 62-63). She had been referred to a neuropsychologist, but she never followed up on it. (Tr. 63). Dishong noted that the doctors felt she had an autoimmune disorder. (Tr. 64).

## II.     Law & Analysis

### A.     Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion, *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

**B.      Step Four: Medical Opinion**

Dishong contends that the ALJ erred in evaluating Dr. Twehues opinion by failing to provide any meaningful explanation as to what portions of the opinion were persuasive and which were not.  ECF Doc. 7 at 18-20.  The Commissioner disagrees, contending in part that the ALJ properly address the medical opinion because portions of it, namely those "opinions" limited with "some" or "somewhat" did not constitute medical opinions requiring evaluation. ECF Doc. 11 at 12-13.

At Step Four of the sequential evaluation process laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[3].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding Dr. Twehues's opinion only partially persuasive.  *See Blakely*,

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

581 F.3d at 405. The ALJ met her obligations under 20 C.F.R. § 404.1520c(c) by identifying and discussing those factors supporting Dr. Twehues's opinion and any inconsistencies with the other medical evidence. (*See* Tr. 30). Although the ALJ did not flag her reasoning by using the regulatory words "supportability" and "consistency," in reading the decision as a whole and with common sense, the ALJ's reasoning as to those factors is clear. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

Specifically, the ALJ identified that Dr. Twehues met with Dishong on only one occasion and provided vague explanations of the work-related limitations she found Dishong to have. (Tr. 30). Because this shows that the ALJ considered the explanations provided by the Dr. Twehues and the type of objective evidence available to her, this satisfied the obligation to address the supportability standard. *See* 20 C.F.R. § 404.1520c(c). Moreover, the ALJ summarized Dr. Twehues's opinion, noting she found limitations in three of the four psychologically based, work-related areas of functioning, and then concluded that these findings were consistent with and supported by the record evidence, more pointedly identifying the opinions of Drs. Rivera and Swain, that the ALJ had discussed in the preceding paragraphs of her decision. (Tr. 30). The ALJ provided a thorough and robust analysis of Dr. Rivera's and Dr. Swain's opinions, and it is from that analysis we can draw conclusions about what portions of Dr. Twehues's opinion the ALJ found persuasive. (*See* Tr. 29-30).

Dishong contends that the ALJ's analysis was specifically vague as to Dr. Twehues's conclusion that she appeared to be prone to a somewhat higher rate of absenteeism, may at times present as irritable and agitated, and that increased stress and pressure would make it more difficult for he to focus and persist on tasks. ECF Doc. 7 at 18-19. However, it is questionable

whether these "findings" even constituted medical opinions.  Under the regulations, a medical

opinion is defined as:

> Statements from acceptable medical sources that reflect judgments about the nature
> and severity of your impairment(s), including your symptoms, diagnosis and
> prognosis, what you can still do despite impairment(s), and your physical or mental
> restrictions.

20 C.F.R. § 404.1527(a)(1).  But each of these statements, when read in the context of

Dr. Twehues's report, failed to provide any meaningful analysis of Dishong's restrictions.  For

example, the sentence following Dr. Twehues's statement that Dishong "appeared prone" to

higher absenteeism reads: "However, she reported leaving her most recent job mostly due to

physical health problems."  (Tr. 953).  Rather than affirmatively concluding that Dishong would

have restrictions on her ability to work due to absenteeism, Dr. Twehues's analysis appears to

have raised nothing more than a passing concern that Dishong *could* have absenteeism issues.

(Tr. 953).  There is nothing definitive about that "restriction."  Even the most definitive

conclusion drawn by Dr. Twehues – that stress and pressure "would likely" make it harder for

Dishong to focus – failed to make a decisive finding about her abilities.  (*See* Tr. 953-954).

But even if these statements were taken as restrictions, the ALJ's discussion of the

opinions of Drs. Rivera and Swain completed the picture necessary for us to conduct a

meaningful review.  In finding Drs. Rivera's and Swain's opinions persuasive, the ALJ noted

that Dishong appeared to have "retained sufficient, residual, cognitive function to serve as [a]

"backstop" against these deficits [with focus and concentration] from becoming fatal."  (Tr. 29).

Similarly, the ALJ found those opinions consistent with Dishong's ability to interact with others,

her history of getting along with others in the workplace, and her ability to focus.  (Tr 29-30).

Although the ALJ did not specifically discuss absenteeism, the ALJ did discuss Dishong's ability

to focus – the same area of functioning in which Dr. Twehues discussed Dishong's potential

penchant for absenteeism.  And the ALJ found that a number of restrictions – consistent with

Dr. Rivera's and Dr. Swain's opinions and the medical evidence of Dishong's average intelligence, intact memory, good concentration, and logical thought processes – sufficiently addressed her limitations. (*See* Tr. 29). Thus, by referring back to her discussion of Dr. Rivera's and Dr. Swain's opinions, the ALJ indicated why she found Dr. Twehues's opinion only partially persuasive. As a result, the ALJ not only satisfied the consistency standard, but provided sufficient explanation for meaningful review. *See Fleischer*, 774 F. Supp.2d at 877.

Further, substantial evidence supports the ALJ's determination that Dr. Twehues's opinion was only partially persuasive. Such evidence includes: (i) treatment notes indicating Dishong had a good memory (Tr. 319, 856, 1034); (ii) treatment notes indicating she had average intelligence (Tr. 287, 1034); (iii) treatment notes indicated she had good concentration (Tr. 319, 858, 1034); (iv) treatment notes indicating she was cooperative (Tr. 287, 856); (v) Dishong's own denial of any difficulties getting along with others in the community or otherwise (Tr. 234-235); and (vi) medical evaluations indicating she had only mild to moderate limitations across her areas of mental functioning (*see* Tr. 288-289, 642). *See Blakely*, 581 F.3d at 406. In light of this evidence, the ALJ's decision was supported by substantial evidence and fell within her "zone of choice." I recommend the ALJ's decision be affirmed. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

### C. Step Four: Residual Functional Capacity

Dishong contends that the ALJ erred in making her RFC findings, because the limitation to perform the standing and walking requirements for light work with frequent handling and fingering were not supported by substantial evidence. ECF Doc. 7 at 20-23. The Commissioner disagrees. ECF Doc. 11 at 15-21.

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e). The RFC is an assessment of a

claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

> Light work is defined under the regulations as:
>
> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking to standing, or when it involves sitting most of the time with some pushing and pulling of arms or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

The ALJ applied the correct legal standards and reached a conclusion supported by substantial evidence in determining Dishong could perform light work.  *See Blakley,* 581 F.3d at 405.  Dishong has not cited any specific evidence that the ALJ either failed to address or that directly undermined the ALJ's finding that Dishong could work at the light exertional level.  *See* ECF Doc. 7 at 20-23.  Dishong identifies numerous records that could support a greater limitation than that found by the ALJ.  But even if a preponderance of the evidence in the record could have supported a different conclusion, once it is determined that substantial evidence supports the ALJ's evaluation, the ALJ's decision cannot be rejected on that basis.  *O'Brien*, *v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  Moreover, Dishong's contention that the ALJ failed to consider these impairments is unfounded, because the ALJ provided an extensive discussion of Dishong's ankle-related issues and carpal tunnel condition.  (Tr. 22-23).

And a review of the record indicates that substantial evidence supports the ALJ's finding that Dishong could perform work at the light exertional level.  As to Dishong's ability to stand and walk, such evidence includes: (i) treatment and therapy notes routinely identifying that she had a normal gait and normal to only minimally affected coordination, reflexes, and strength (*see e.g.*, Tr. 309, 319, 423, 425, 427, 429, 431, 433, 435-436, 560, 699, 998, 1001); (ii) medical opinions identifying only moderate limitations in her ability to walk, sit, and stand (Tr. 105, 118, 942-943); and (iii) a history of conservative treatments of her back and ankle (*see e.g.*, Tr. 296-298, 646, 780, 782, 1043-1045, 1001).  *See Blakely*, 581 F.3d at 406.

As to Dishong's hand limitations, such evidence includes: (i) testing indicating only mild neuropathy (*see* Tr. 509); (iii) treatment notes indicating mild or benign restrictions in her sensory functioning and use (*see* Tr. 309, 436, 1038, 1042); (iii) a history of conservative treatments (*see* Tr. 310, 435); and (iv) medical opinions identifying that Dishong's manipulative abilities were limited (*see* Tr. 105, 119, 848, 943, 1056).  *See Blakely*, 581 F.3d at 406.  Taking this evidence into consideration, and in light of the limitations the ALJ *did* find as to Dishong's manipulation abilities and ability to walk, stand, and sit, I cannot find that the ALJ's RFC was unreasonable and unsupported by substantial evidence.  I recommend that the ALJ's decision be affirmed.

## III.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dishong's application for DIB be affirmed.

Dated: August 28, 2023

Thomas M. Parker
United States Magistrate Judge

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).